Filed 4/1/22  P. v. Ramirez CA2/7
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B265610 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA130983-02) |
| v. | |
| ROBERT ANTONIO RAMIREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Olivia Rosales, Judge.  Reversed and remanded with instructions.

Jerome McGuire, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala Harris, Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Shezad H. Thakor, Michael C. Keller and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Applying the natural and probable consequences doctrine, a jury convicted Robert Antonio Ramirez of two counts of attempted willful, deliberate and premeditated murder, two counts of assault with a firearm and one count of shooting at an inhabited dwelling and found true criminal street gang and firearm-use enhancement allegations. We affirmed those convictions on two prior occasions (in 2017 and 2019) based on the law as it existed at the time of our decisions.[1]

Directed by the Supreme Court earlier this year to reconsider Ramirez's case in light of recent ameliorative legislation, we now reverse the convictions for attempted murder, as well as the criminal street gang enhancements imposed on all counts. Our decision is based on Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill 1437), effective January 1, 2019, which eliminated accomplice liability for murder under the natural and probable consequences doctrine; Senate Bill No. 775 (Stats. 2021, ch. 551, § 2) (Senate Bill 775), effective January 1, 2022, which expanded the reach of Senate Bill 1437 to include

_____

[1] In our 2019 decision, although we affirmed Ramirez's convictions, we remanded the matter for the trial court to consider whether to exercise its discretion pursuant to Senate Bill No. 620 (Stats. 2017, ch. 682), effective January 1, 2018, to strike or dismiss the formerly mandatory firearm-use enhancements imposed under Penal Code section 12022.53, subdivisions (c) and (e)(1), and pursuant to Senate Bill No. 1393 (Stats. 2018, ch. 1013), effective January 1, 2019, to dismiss the formerly mandatory prior serious felony enhancement imposed under Penal Code section 667, subdivision (a). The trial court is to consider its discretion to dismiss these enhancements upon resentencing Ramirez following the remand we again order.

convictions for attempted murder and voluntary manslaughter and provided a defendant convicted under a now invalid theory of murder or attempted murder may seek relief on direct appeal in lieu of the postjudgment petition process created by Senate Bill 1437; and Assembly Bill No. 333 (Stats. 2021, ch. 699, § 3) (Assembly Bill 333), effective January 1, 2022, which increased the proof requirements for imposition of a criminal street gang enhancement, modifying the definitions of "criminal street gang" and "pattern of criminal gang activity" and clarifying the evidence needed to establish an offense benefits, promotes, furthers or assists a criminal street gang.

Ramirez and the Attorney General agree these reversals are necessary in light of the retroactive effect of the ameliorative legislation cited. However, they disagree on several issues concerning the scope of proceedings following remand: Should the prosecution be afforded the opportunity to retry Ramirez on a still-valid theory of attempted murder? Is new Penal Code section 1109,[2] which provides, at the election of the defense, the defendant's guilt of the underlying offenses must be determined before trial of gang enhancements, retroactive? If section 1109 is retroactive, must Ramirez's convictions for aggravated assault and shooting at an inhabited dwelling be reversed because those counts were tried together with the gang enhancement allegations? We agree with the Attorney General the answer to the first question is yes. We need not answer the second question because the answer to the third question is no: Even if

---

[2]     Statutory references are to this code unless otherwise stated.

section 1109 is retroactive, any error in trying the remaining substantive counts with the gang enhancements was harmless.

We reverse Ramirez's convictions for attempted murder and affirm the convictions for assault with a firearm and shooting at an inhabited dwelling, but reverse the true findings on the criminal street gang enhancements associated with those counts. The cause is remanded to provide the prosecution an opportunity to retry Ramirez on a legally viable theory of attempted murder and to retry the criminal street gang enhancements. If the People elect not to do so, Ramirez is to be resentenced in accordance with the terms of all applicable ameliorative legislation.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Shooting*

In July 2013 Joe Gandara and his sister's boyfriend, Gilbert, stood outside a corner market in South Gate waiting for Gandara's brother, Steve Barraza, to leave the store.[3] Gilbert belonged to the Grape Street Watts gang and had prominent gang tattoos. While they were waiting, Ramirez, a member of the Lynwood Young Crowd gang who also had prominent gang tattoos, rode his bicycle toward Gandara and Gilbert, staring at them, and then rode back to an apartment complex on the corner across from the market. After Ramirez left, Gilbert told Gandara that Ramirez had previously approached him, but nothing had come of it.

Ramirez returned on his bicycle several seconds later and rode up the sidewalk within three to four feet of Gandara and

---

[3]    Gandara was the only one of the three victims to testify. Gilbert (Gandara did not know his last name) and Barraza were never located by the police.

Gilbert.  Ramirez appeared calm and asked, "Where you guys from?"  Gandara, who was not a member of a gang, understood Ramirez was asking what gang they were from and said nothing. Gilbert answered he was from Grape Street Watts.  Ramirez, who had the letters Y and C tattooed on his face, said, "This is Lynwood Young Crowd" or, perhaps, "I am Lynwood Young Crowd."  Gandara and Gilbert answered, "OK," and Ramirez returned to the apartment complex.[4]

At this point Barraza came out of the market; and Gandara, Barraza and Gilbert began walking down the block to their house, which was five lots from the corner.  Gandara told Barraza "some guy" had just "hit [them] up."  Barraza, a member of the South Side Lynwood gang, told him not to worry about it.  Looking back at the apartment complex as they passed, Gandara saw Ramirez on his bike and three men standing next to the building, one with his hand tucked inside his waistband.  That man began running toward Gandara, Barraza and Gilbert and yelled, "Hey, fuck Fake Street" (a derogatory name for Grape Street).  Barraza said, "He's got a gun.  Hurry up.  Let's go."  Gandara, who had a bike, began pedaling harder.  Barraza and Gilbert ran.  As they fled, Gandara saw the man with the gun running after them, followed by one of the other two men.  Ramirez, still on his bike, was slowly following the man with the gun, who was never identified, and a man later identified as Ramirez's brother, Andres, down the street.  Gandara never saw Ramirez talk or gesture to the man with the gun.

---

[4]    At the preliminary hearing Gandara stated he had not been concerned after the exchange with Ramirez because "it was like a friendly-type encounter."

Gandara followed Barraza and Gilbert into their driveway toward the rear building where they lived. As Gilbert ran up the stairs to their apartment, Gandara again looked back and saw Ramirez was still "way back" toward the market, weaving back and forth on his bike. The man with the gun, who had reached the driveway, shot twice from the street toward the rear building. No one was struck. Abandoning his bike, Gandara climbed onto a neighbor's roof. He saw Andres standing across the street from the driveway. He did not see Ramirez after the shots were fired.

2. *The Investigation*

Responding South Gate police officers recovered a bullet fragment on the driveway next to the wall of the rear structure, located a bullet impact mark on the wall of the structure above the fragment and found two expended cartridge casings in the front yard adjacent to the street. At the apartment complex officers found Ramirez's brother, Andres, an Elm Street Watts gang member, and Efrain Parra, a Willow Street gang member, as well as a black BMX bike, in an apartment rented to Ramirez's mother. Later, Ramirez and his mother arrived in her car and parked in the complex carport. In the carport near Ramirez's mother's car a detective found two semiautomatic handguns wrapped in a rag. Four live rounds and two expended shell casings were recovered from the handguns. Forensic examination confirmed the cartridge casings and bullet fragments recovered from the shooting scene had been fired by one of the guns found in the carport.

In a field show-up Gandara identified Andres, Ramirez and Parra as the men who had watched the shooter and the bike found in the Ramirez apartment as the one ridden by Ramirez. Later

6

that day Gandara identified Ramirez in a photographic lineup as the one who had ridden the bike.

### 3. *The Information*

Ramirez was charged with two counts of attempted willful, deliberate and premeditated murder (§§ 187, subd. (a), 664) (counts 1 and 2), two counts of assault with a firearm (§ 245, subd. (a)(2)) (counts 3 and 4), and one count of shooting at an inhabited dwelling (§ 246) (count 5). As to all counts the information alleged the crimes had been committed for the benefit of a criminal street gang (§ 186.22, subds. (b)(1)(B) & (C), (b)(4)). As to counts 1, 2 and 5 the information alleged a principal had personally used and intentionally discharged a firearm (§ 12022.53, subds. (c), (e)(1)). The information further alleged Ramirez had suffered a prior conviction for a serious or violent felony within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12) and a serious felony conviction under section 667, subdivision (a)(1), and had served two prior prison terms for felonies within the meaning of section 667.5, subdivision (b).

Ramirez pleaded not guilty and denied the special allegations.

### 4. *The People's Gang Evidence*

The People presented evidence from two gang experts. South Gate Police Detective Christian Perez, an investigator with six years of experience investigating gang-related crimes in South Gate, had previous contact with Ramirez, who had admitted to Perez he was a member of the Lynwood Young Crowd gang with a moniker of "Snoops." Perez testified the area near the corner market was claimed by numerous gangs. Without identifying members of the gang other than Ramirez, Perez stated members

of Lynwood Young Crowd who lived in the area claimed the area as their territory. Gang members claim territory by "hitting up" other gang members in the area, that is, asking where others are from; stating where the gang member is from; assaulting other gang members with fists, weapons or guns; or tagging the area with graffiti. Gang members try to instill fear and intimidation in residents of the community and in rival gang members to establish respect for themselves and their gangs.

Los Angeles County Sheriff's Detective Marc Boisvert, assigned to the Sheriff's gang investigation unit, testified he had once patrolled Lynwood and was familiar with the Lynwood Young Crowd gang. According to Detective Boisvert, South Gate, and specifically the corner market, was not in territory traditionally claimed by Lynwood Young Crowd. That gang's principal rivals were South Side Lynwood, South Side Gangsters, Lynwood Neighborhood Crips and Lynwood 211 Crips. According to Boisvert, it was not uncommon for family members to belong to different—even rival—gangs and to assist one another in committing crimes. The primary activities of the Lynwood Young Crowd gang include felony vandalism, shootings, assaults, drug sales, weapons possession and murder.

Although Detective Boisvert did not personally know Ramirez and had no experience with South Gate gangs, his research (including conversations with other officers) revealed Ramirez was an active member of Lynwood Young Crowd. Boisvert also testified that the question "Where are you from?" is a challenge that usually leads to a violent altercation, especially when the gang member questioned claims his gang. If a gang member issuing such a challenge was outnumbered, he might wait until he had the support of others to initiate violence. If a

8

gang member lives in territory claimed by other gangs, he would still be expected to represent his gang and make his name and the gang's name known in the area. In gang culture disrespect leads to violence. "Fake Street" is a derogatory term for the Grape Street gang.

Detective Boisvert testified about two predicate convictions involving Lynwood Young Crowd gang members who were each found guilty of second degree murder. Given a hypothetical based on the evidence presented against Ramirez, Boisvert opined the shooting had been committed on behalf of a criminal street gang: A gang member had hit up the victims and claimed his own gang; the crime was committed in association with a criminal street gang because the gang member was assisted by other individuals, one of whom yelled a derogatory reference to the gang claimed by one of the victims; and instilling fear benefits the gang, in this case, Lynwood Young Crowd.

5. *The Defense Evidence*

Ramirez did not testify at trial. Martin Flores, the director of a center providing services to at-risk youth who had worked in Watts for many years and knew South Gate well, testified on behalf of the defense. Flores agreed with Detective Boisvert's description of Lynwood Young Crowd's territory and confirmed that the gang's territory was far from the area of the incident. He also opined a gang member who moves into another gang's territory must "respect that neighborhood," then "you have a pass . . . to go from your house to . . . the bus stop, the market" and "other places in the neighborhood." A gang member claiming the area around the corner market for Lynwood Young Crowd would be "looking for trouble."

9

Considering the same hypothetical posed to Detective Boisvert, Flores believed it would be important to know the gang affiliation of the shooter, as well as those of the other men who participated in the incident, to understand whether the crime benefited Lynwood Young Crowd. Although he acknowledged gang members from different gangs do commit crimes together, he "disagree[d] that those crimes are done on behalf of a hood." In light of the participants' differing gang affiliations, Flores opined the shooting did not have to do with a particular gang; instead, "very likely" the shooting was "a personal response" tied to the shooter's rivalry with Grape Street Watts. Lynwood Young Crowd and Grape Street are not rivals.

Flores also disagreed with Detective Boisvert's assertion that any time a gang member hits someone up, violence is likely to result. In Flores's experience many such encounters do not result in violence and are simply inquiries, particularly when a gang member moves into a new area.

6. *Jury Instructions and Verdict*

The jury was instructed with CALCRIM No. 400, advising it a person is guilty of a crime whether he or she "committed it personally or aided and abetted the perpetrator," and CALCRIM No. 401, defining the elements for finding the defendant guilty of a crime based on aiding and abetting that crime. Over Ramirez's objection that there was insufficient evidence for the jury to find Ramirez had committed the uncharged (target) crime of disturbing the peace in violation of section 415 by challenging someone to a fight, the court instructed the jury pursuant to CALCRIM No. 403 that, "[b]efore you may decide whether the defendant is guilty of attempted murder and/or assault with a firearm and/or shooting at an inhabited dwelling, you must decide

10

whether he is guilty of disturbing the peace." If Ramirez is guilty of disturbing the peace (the target offense), the court continued, he may be found guilty of attempted murder and/or assault with a firearm and/or shooting at an inhabited dwelling (the nontarget offenses) if the People proved that, during the commission of the target offense, a coparticipant in the target offense committed one or more of the nontarget offenses and "[u]nder all the circumstances, a reasonable person in the defendant's position would have known that the commission of [one or more of those offenses] was a natural and probable consequence of the commission of disturbing the peace."[5] The court defined "coparticipant" in the language of CALCRIM No. 403 as "the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander."

In closing argument the prosecutor read the jury excerpts from CALCRIM No. 403 and argued, relying on Detective Boisvert's testimony that a hit-up usually leads to gang violence, Ramirez's apparent communication with the shooter regarding Gilbert's affiliation with Grape Street Watts and the discovery of the handguns in the carport, that Ramirez and the shooter were coparticipants in unlawfully challenging Gandara and Gilbert to fight and that shooting at the three men was the natural and probable consequence of that uncharged offense.

The jury convicted Ramirez on all counts, found the attempted murders had been committed willfully, deliberately and

---

[5] The court separately instructed on the elements necessary to prove disturbing the peace (CALCRIM No. 2688), attempted murder (CALCRIM Nos. 600 & 601), assault with a firearm (CALCRIM No. 875) and shooting at an inhabited house (CALCRIM No. 965).

11

with premeditation, and found true the special firearm-use and criminal street gang enhancement allegations. Ramirez waived trial and admitted the prior conviction and prison term allegations. Ramirez moved unsuccessfully for a new trial on the ground there was insufficient evidence to support a conviction for attempted murder as a natural and probable consequence of the offense of disturbing the peace. The court sentenced Ramirez to an aggregate term of 14 years to life plus 25 years in state prison.

## DISCUSSION

1. *Senate Bills 1437 and 775 Require Reversal of Ramirez's Convictions for Attempted Murder*

As discussed, Senate Bill 1437 eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843.)[6] In addition to substantively amending sections 188 and 189, Senate Bill 1437 added section 1170.95, which provides a procedure for individuals convicted of murder who could not be convicted under the law as amended to retroactively seek relief. (See *People v. Lewis* (2021) 11 Cal.5th 952, 959; *Gentile*, at p. 843.) The ameliorative provisions of Senate Bill 1437 as enacted, however, did not apply on direct appeal to convictions that were not yet final before the law became effective. (*Gentile*, at p. 852.) "Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Ibid.*)

---

[6] Senate Bill 1437 also significantly narrowed the felony-murder exception to the malice requirement for murder. (See §§ 188, subd. (a)(3), 189, subd. (e); *People v. Lewis* (2021) 11 Cal.5th 952, 957.)

As amended by Senate Bill 775 section 1170.95, subdivision (a), now provides, "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts . . . ."[7]  In addition, new subdivision (g) of section 1170.95[8] authorizes a defendant on direct appeal to challenge his or her conviction based on the new limits on accomplice liability for homicide:  "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437."

Ramirez's convictions for attempted murder, as well as for aggravated assault and shooting at an inhabited dwelling, were based on the natural and probable consequences doctrine.  As discussed, the court instructed the jury it could convict Ramirez of attempted murder, assault with a firearm and shooting at an

---

[7]  In an uncodified statement of its intent in enacting Senate Bill 775, the Legislature declared the legislation "[c]larifies that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories."

[8]  Former subdivision (g) of section 1170.95 was redesignated subdivision (h).

13

inhabited dwelling if he was guilty of the uncharged target offense of disturbing the peace, a coparticipant in that crime committed one or more of the charged offenses, and those offenses were the natural and probable consequence of the target offense.

Although the court also instructed the jury generally on direct aiding and abetting, in closing argument the prosecutor did not argue Ramirez was guilty as a principal in the attempted murders, instead explaining the People's case rested on the natural and probable consequences instruction. Ramirez should be found guilty of the charged nontarget offenses, the prosecutor asserted, because he challenged Gandara and Gilbert to fight, committing the uncharged target offense of disturbing the peace. Ramirez then returned to his apartment building and apparently told the shooter that Gilbert belonged to Grape Street Watts. The shooter participated in the challenge to fight by yelling, "Fuck Fake Street," and then committed the charged nontarget offenses of attempted murder, aggravated assault and shooting at an inhabited dwelling, all of which were the natural and probable consequence of the gang/fight challenges.

While questioning the evidentiary support for the prosecutor's theory, defense counsel agreed Ramirez could be convicted only if the jury found the unnamed shooter's actions were the natural and probable consequence of Ramirez's limited role in the incident. Defense counsel argued, without objection, the prosecutor has "given up on the fact that this is some sort of aider and abettor situation."

Ramirez and the Attorney General agree, as do we, that because Ramirez's convictions for attempted murder are not yet final and were based on instructions incorporating a now invalid legal theory, they must be reversed. (See *People v. Aledamat*

(2019) 8 Cal.5th 1, 3 [conviction that may have been predicated on erroneous or invalid legal theory must be reversed unless, based on all the circumstances, the reviewing court determines the error was harmless beyond a reasonable doubt]; *People v. Chiu* (2014) 59 Cal.4th 155, 168 (*Chiu*) [same].)

Generally, whether or not an alternate theory of liability was proffered at trial, when we reverse convictions due to a retroactive change in the law, not insufficient evidence, retrial remains theoretically possible if the People believe the evidence would support a conviction on a viable legal theory. (See *Chiu, supra*, 59 Cal.4th at p. 168 [allowing the People to retry charge of first degree murder on a direct aiding and abetting theory when jury may have improperly based prior verdict on natural and probable consequences doctrine]; see also *People v. Gutierrez* (2018) 20 Cal.App.5th 847, 857 [permitting new trial on charge of unauthorized taking of an automobile when evidence of value of automobile not introduced at original trial and Supreme Court had not yet ruled on Proposition 47's applicability to Vehicle Code section 10851]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, fn. 2 [permitting new trial where statutory amendments added new element to offense after original trial].) Ramirez, however, insists this principle does not apply here, and permitting a retrial would place him in double jeopardy, because the prosecutor and defense counsel "effectively stipulated that there was insufficient evidence to support a direct aiding and abetting conviction." Moreover, Ramirez argues, the evidence presented at his trial would have been legally insufficient to convict him on a direct aiding and abetting theory.

Ramirez, who provides no legal support for this novel argument, overstates the record. The prosecutor certainly agreed

15

his case was predicated on the natural and probable consequences doctrine and Ramirez's role in the uncharged target misdemeanor offense.  And the People's evidence at trial was directed to that theory of culpability.  But the prosecutor never stipulated (either actually or effectively) there was insufficient evidence to proceed on a theory of direct aiding and abetting.  It may be that, in fact, there is no such evidence.  If so, we presume there will be no new trial for attempted murder.  However, the People are entitled to an opportunity to evaluate the case and to proceed on a legally viable theory of attempted murder if, in good faith, a prosecution should be pursued.

2. *Substantial Evidence Supported Ramirez's Remaining Convictions Under the Natural and Probable Consequences Doctrine*

In his prior appeals, in addition to challenging the continued validity of the natural and probable consequences doctrine for charges of attempted willful, deliberate and premeditated murder, Ramirez argued the evidence was insufficient to support application of the doctrine to any of the nontarget offenses for which he was convicted.  He raised three distinct points:  There was insufficient evidence to convict him of the target offense, disturbing the peace; he was the sole perpetrator of that offense (if it was committed), not an aider and abettor or coparticipant within the meaning of the natural and probable consequences doctrine; and the target offense was too trivial to support the serious felonies with which he was charged.  As we have twice before—and in the absence of any new legislation or case law affecting our prior analysis—we again reject each of these contentions.

16

a. *Governing law*

In *People v. Prettyman* (1996) 14 Cal.4th 248 the Supreme Court—after noting, "It sometimes happens that an accomplice assists or encourages a confederate to commit one crime, and the confederate commits another, more serious crime (the nontarget offense)" (*id.* at p. 259)—explained the elements of the natural and probable consequences doctrine: "[T]he jury must decide: whether the defendant (1) with knowledge of the confederate's unlawful purpose; and (2) with the intent of committing, encouraging, or facilitating the commission of any target crime(s); (3) aided, promoted, encouraged, or instigated the commission of the target crime(s). The jury must also determine whether (4) the defendant's confederate committed an offense *other than* the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated." (*Id.* at p. 271; accord, *Chiu, supra,* 59 Cal.4th at p. 158 ["'under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted'"'"].)

"A nontarget offense is a "'natural and probable consequence'" of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability "'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.'" [Citation.] Reasonable foreseeability 'is a factual

17

issue to be resolved by the jury.'" (*Chiu, supra*, 59 Cal.4th at pp. 161-162.)

In *People v. Smith* (2014) 60 Cal.4th 603 (*Smith*) the Supreme Court rejected the defendant's argument that principals in the target crime may not be found guilty of nontarget crimes, even if those nontarget crimes are otherwise foreseeable, if they did not intend to aid and abet the perpetrator of the nontarget offenses. The defendant had been convicted of the murders of two of his fellow gang members who were shot by members of a rival gang as the outgrowth of an incident in which the two rival gangs had cooperated in staging a "jump out"[9] and, in doing so, had aided and abetted each other in committing the target crimes of disturbing the peace and assault or battery. (*Id.* at pp. 611-612.) As described by the Supreme Court, "The prosecutor had argued that during the commission of the target crimes, a principal in those crimes (a member of [the rival gang]) committed the murders, and the murders were the natural and probable consequence of the target crimes." (*Id.* at p. 612.) Affirming Smith's convictions, the Court noted his liability "was based on his being a principal [in the target offenses] under Penal Code section 31" (*ibid.*) and concluded the jury could have reasonably found that all the possible shooters had been aiders and abettors in the target offenses (disturbing the peace and assault), and therefore principals in those offenses, regardless of their gang affiliation. (*Id.* at p. 619.) Thus, at least in the context of gang violence, the Supreme Court sanctioned the use of the natural and

---

[9]    "'[I]n order to get out of a gang, a member must be "jumped out," which typically involves a beating of that member by the same members who jumped him or her into the gang.'" (*People v. Smith, supra*, 60 Cal.4th at p. 608.)

probable consequences doctrine to impose liability on any principal (whether perpetrator or aider-or-abettor) in the target offense when another principal (whether perpetrator or aider-or-abettor) in that offense commits a reasonably foreseeable nontarget offense.

      b. *Substantial evidence supported the jury's implied finding Ramirez committed the target offense of disturbing the peace*

The target offense identified by the court in instructing the jury was disturbing the peace, a violation of section 415, subdivision (1), which imposes misdemeanor liability on "[a]ny person who unlawfully fights in a public place or challenges another person in a public place to fight." As discussed, Ramirez first rode his bicycle toward Gandara and Gilbert while staring at them. He returned shortly thereafter, rode close to them and asked, "Where you guys from?" When Gilbert answered he was from Grape Street Watts, Ramirez identified either the territory or himself as Lynwood Young Crowd. Citing Gandara's testimony acknowledging the lack of aggression or threat in Ramirez's conduct—thereby purportedly negating any intent to provoke a fight—and his expert's testimony that similar questions frequently do not result in violence, Ramirez argued the prosecution's evidence was insufficient to support a finding he had challenged Gilbert and Gandara to a fight.

Ramirez's subjective intent in hitting up Gilbert and Gandara is irrelevant. Specific intent to provoke a fight is not required to establish culpability under section 415, subdivision (1): "A *challenge* to fight is prohibited because such a challenge may provoke a violent response that endangers not only the challenger but any other persons who may be in the public

19

place where the challenge occurs. . . . The mere fact that the challenger may naively believe that his challenge will go unanswered does not reduce the danger that the challenge poses to both the challenger and the public. Since the danger that a challenge to fight creates, and that the Legislature intended to prohibit, is unaffected by the challenger's subjective intent to actually cause a fight or his subjective belief that a fight will not occur or is unlikely to occur, no specific intent is required." (*In re Cesar V.* (2011) 192 Cal.App.4th 989, 998-999, fns. omitted.) Based on Detective Boisvert's testimony that the question "Where are you from?" initiated a challenge to fight, the jury could reasonably conclude Ramirez committed a violation of section 415, subdivision (1).

Ramirez's additional argument that violence was only a possible, not a probable, result of his conduct was an invitation for us to reweigh the evidence. We once again decline that invitation. (See, e.g., *People v. Medina* (2009) 46 Cal.4th 913, 922 [gang member's question "'where are you from?'" must be understood as "'what gang are you from?'" and is "a verbal challenge, which (depending on the response) could lead to a physical altercation and even death"].)

c. *The jury could reasonably conclude Ramirez did not act alone in committing the target offense*

As discussed, the jury was instructed that to find Ramirez guilty of aiding and abetting the charged offenses it had to first decide whether he was guilty of the target offense (disturbing the peace) and find that "[d]uring the commission of disturbing the peace a coparticipant in that disturbing the peace committed the crime of attempted murder and/or assault with a firearm and/or shooting at an inhabited dwelling." (CALCRIM No. 403.) A

20

"*coparticipant*" was defined to include "anyone who aided and abetted the perpetrator." (*Ibid*.) Ramirez contends, even if he challenged Gilbert and Gandara to fight, he was the sole perpetrator of the target offense. Without the shooter also participating in that offense, Ramirez argued, he (Ramirez) could not be convicted of the charged felonies as a natural and probable consequence of the challenge.

Viewing the evidence in the light most favorable to the verdict, as we must (*People v. Morales* (2020) 10 Cal.5th 76, 88), there was sufficient evidence to support the jury's conclusion Ramirez committed the crime of disturbing the peace as a coparticipant in a common plan with the shooter to start a fight. Ramirez first rode his bike by Gilbert and Gandara, evaluating them, before returning to the apartment complex where the other gang members awaited. He reemerged and hit up Gilbert and Gandara, asking "Where are you from?" before announcing his own affiliation with Lynwood Young Crowd. He then returned to the complex only to emerge again with the other gang members who commenced the assault. The jury could reasonably infer from Ramirez's actions, as well as the shooter's shouted gang slur, that Ramirez was acting at the instigation or with the encouragement of the shooter and his associates when he approached Gilbert and his friends the second time and attempted to provoke a fight and that he had thereafter identified Gilbert as a member of Grape Street Watts to his coparticipants, who proceeded to commit the nontarget offenses.

> d. *The target crime was not too trivial to support the convictions on the charged crimes*

Ramirez also contended the People could not rely on the natural and probable consequences doctrine to obtain convictions

for serious crimes, such as shooting at an inhabited dwelling, when the defendant had only committed a "trivial" misdemeanor, here, disturbing the peace.  In advancing this argument Ramirez relied on language from *People v. Montes* (1999) 74 Cal.App.4th 1050 in which the court of appeal affirmed the defendant's conviction for attempted murder during a gang fight that had originated with a gang challenge and ended in a shooting.  (*Id.* at p. 1053.)  Reviewing *People v. Prettyman*, *supra*, 14 Cal.4th 248 and its progeny, the *Montes* court first observed that "decisions applying [the natural and probable consequences doctrine] 'most commonly involved situations in which a defendant assisted or encouraged a confederate to commit an assault with a deadly weapon or with potentially deadly force, and the confederate not only assaulted but also murdered the victim.'" (*Montes*, at p. 1055.)  Continuing, the court stated:  "On the other hand, it is rarely, if ever, true that 'an aider and abettor can "become liable for the commission of a very serious crime" committed by the aider and abettor's confederate [where] "the target offense contemplated by his aiding and abetting [was] trivial."' [Citation.] 'Murder, for instance, is *not* the natural and probable consequence of trivial activities.  To trigger application of the "natural and probable consequences" doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed.'" (*Ibid.*)  The *Montes* court concluded the threats and initial fighting between the rival gangs in the case before it were not trivial in nature and were closely connected to the escalation of the fight by the gang member who pulled a gun, a "textbook example of how a gang confrontation can easily escalate from mere shouting and shoving to gunfire." (*Ibid.*)

The extended discussion in *Montes* clarifies that a gang challenge that precipitates a gang fight can be a nontrivial instigator of more serious crimes resulting from that fight.  There simply is no per se rule that precludes use of the natural and probable consequences doctrine when the target offense is disturbing the peace through a gang challenge.  The question in each case is whether substantial evidence supports the jury's findings.  (See *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1449 ["[j]urors in a number of cases have found shootings to be foreseeable consequences of gang confrontations, and those findings have been affirmed on appeal"].)  As explained, the jury here had sufficient evidence to support its conclusion a gang challenge was issued by Ramirez as a coparticipant in a common plan to start a fight, which led to the serious felonies committed by his confederate.

> 3. *Assembly Bill 333 Requires Reversal of the True Findings on the Criminal Street Gang Enhancements*

Section 186.22. subdivision (b), provides for enhanced punishment when a defendant is convicted of a felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  Assembly Bill 333 made a number of significant modifications to the requirements for proving a criminal street gang enhancement.  Ramirez and the Attorney General agree, and we have previously held (see *People v. Delgado* (2022) 74 Cal.App.5th 1067), that, under the principles enunciated in *In re Estrada* (1965) 63 Cal.2d 740, Assembly Bill 333's amendments to section 186.22 apply retroactively to defendants whose convictions are not yet final. (See also *People v. E.H.* (2022) 75 Cal.App.5th 467.)

Previously, proof of a "pattern of criminal gang activity" as defined by section 186.22, subdivision (e), required evidence of two or more identified predicate offenses, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." As amended, subdivision (e) now requires proof that (i) the last offense used to show the pattern of criminal gang activity occurred within three years of the date the currently charged offense is alleged to have been committed; (ii) the offenses were committed on separate occasions or by two or more gang members, rather than simply "persons"; (iii) the offenses commonly benefited a criminal street gang, and the common benefit was more than reputational; and (iv) the currently charged offense cannot be used to establish the pattern.

New section 186.22, subdivision (g), provides "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational." The new subdivision provides as examples of a common benefit that is more than reputational "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

The Attorney General concedes the gang evidence at Ramirez's trial, presented under the old law, fell short of meeting these new requirements. Specifically, the Attorney General explains, the prosecution did not prove the predicate offenses identified by the People's gang expert (two convictions for second degree murder) benefited the gang in ways that were more than reputational. Similarly, the prosecution gang's expert, in

response to a hypothetical question, testified the charged offenses benefited Ramirez's gang by instilling fear in others, that is, by enhancing its reputation for violence. Without cataloguing possible additional shortcomings in the gang evidence, Ramirez agrees with the Attorney General's concession that a remand for retrial of the criminal street gang enhancements on the remaining counts is necessary. We agree, as well.

4. *Any Error in Trying the Criminal Street Gang Enhancement Allegations Together with the Substantive Offenses Was Harmless*

In addition to amending section 186.22, Assembly Bill 333 added section 1109, which, at the request of the defendant, requires a gang enhancement allegation be bifurcated and tried after the underlying charges, with the truth of the enhancement determined only after a guilty verdict. The Attorney General contends this new statute, unlike other provisions of Assembly Bill 333, does not apply retroactively, citing case law he argues stands for the proposition that changes in trial procedures apply prospectively if they do not alter the substantive requirements for proving a crime or the truth of an enhancement allegation or reduce the available punishment in the event of a conviction. (E.g., *People v. Cervantes* (2020) 55 Cal.App.5th 927, 939-940 [new requirements for interrogations not retroactive]; *People v. Sandee* (2017) 15 Cal.App.5th 294, 305, fn. 7 [limitation on governmental search of cell phones not retroactive].)

Relying primarily on *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, which held the provisions in Proposition 57 that modified the procedural requirements for trying a juvenile in adult criminal court applied retroactively to all cases not final on its effective date because "it ameliorated the possible punishment

for a class of persons, namely juveniles" (*id*. at p. 308), Ramirez argues the ameliorative benefits of bifurcating trial of gang enhancement allegations "are manifest," and the same inference of retroactivity should apply as in *Lara*. Ramirez then argues the failure to bifurcate trial of the criminal street gang enhancements in his case constituted prejudicial error because the jury would not have heard that two Lynwood Young Crowd members had committed murder (the predicate acts) or that the primary activities of the gang "include, but [are] not limited to . . . felony vandalism, shootings, weapons possession and murder."

We need not decide whether Ramirez or the Attorney General is correct about the retroactive applicability of section 1109; for, even accepting Ramirez's contention it was error to try the gang enhancements together with the substantive offenses, any such error was harmless. (See, e.g., Cal. Const., art. VI, § 13 ["[n]o judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"]; *People v. Gonzalez* (2018) 5 Cal.5th 186, 195 ["We evaluate nonstructural state law error under the harmlessness standard set forth in [*People v.*] *Watson* [(1956)] 46 Cal.2d [818,] 836-837. That standard requires us to evaluate whether the defendant has demonstrated that it is "'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"'"].)

As Ramirez implicitly recognizes by citing only the brief gang expert testimony concerning the two predicate act murders and the listing of the Lynwood Young Crowd's primary activities,

all the other gang evidence admitted in the case would have been before the jury even if no gang enhancements were being tried. Indeed, the entirety of the case depended on such evidence, which was unquestionably admissible: Ramirez's membership in the Lynwood Young Crowd gang, the concept of claiming territory by "hitting up" other gang members in the area, the significance of instilling fear to intimidate residents and members of other gangs, and the gang expert's experience that challenges such as those issued first by Ramirez and then by the shooter usually lead to a violent altercation. Viewing the record as a whole, it is not reasonably probable that, with all the gang evidence admitted save only the testimony concerning predicate acts and primary activities, the jury would not have accepted the prosecutor's argument that Ramirez committed the target misdemeanor of disturbing the peace by challenging another person in a public place to fight and that the shooter's continuation of that gang challenge by chasing and shooting the victims was a natural and probable consequence of Ramirez's conduct.

Ramirez's reliance on this court's divided decision in *People v. Albarran* (2007) 149 Cal.App.4th 214 to argue trial of gang allegations together with substantive charges, assuming error at all, violates a defendant's right to due process and constitutes federal constitutional error subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 is misplaced. The *Albarran* majority recognized, if gang evidence has been admitted in violation of state law rules, prejudice would generally be analyzed under the *Watson* harmless error standard. (*Albarran*, at p. 229.) However, the majority concluded the gang evidence at Albarran's trial was so inflammatory and the trial court's errors in allowing the evidence and then denying

Albarran's new trial motion so egregious, that Albarran's trial was "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Id.* at p. 232.)

To reach that concededly unusual conclusion, the *Albarran* majority catalogued the "panoply of incriminating gang evidence" presented by the prosecution, including its gang expert's lengthy testimony "about the identities of other 13 Kings members, the wide variety of crimes they had committed and the numerous contacts between the various gang members (other than Albarran) and the police. [The expert] described a specific threat 13 Kings had made in their graffiti to kill police officers. The jury heard references to the Mexican Mafia both during the prosecutor's opening argument and in [the gang expert's] testimony." (*People v. Albarran, supra,* 149 Cal.App.4th at pp. 227-228.) Based on the extensive amount of extremely prejudicial evidence introduced, the majority reasoned, "there was a real danger that the jury would improperly infer that whether or not Albarran was involved in these shootings, he had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished. . . . In our view, looking at the effect of this evidence on the trial as a whole, we believe that this prejudicial gang evidence was "'of such quality as necessarily prevents a fair trial.'"" (*Id.* at pp. 230-231.)

The limited gang evidence that would not have been admitted in a bifurcated trial here stands in sharp contrast to the extensive, Mexican Mafia-infused testimony that led the *Albarran* majority to find a "rare and unusual" due process violation. *Watson*, not *Chapman*, provides the appropriate harmless error

standard in this case.  As discussed, Ramirez has failed to demonstrate a reasonable probability he would have achieved a more favorable outcome at trial for aggravated assault and shooting at an inhabited dwelling if the gang enhancements had been tried separately.

     5.  *The Prosecutor's Misstatement of the Evidence Was*
         *Rendered Harmless by the Trial Court*

In his original briefing in this court, Ramirez also argued the trial court committed reversible error when it denied his motion for mistrial after the prosecutor misstated in his closing argument that someone had yelled "Hey, fuck Fake Street!" when the shooter and Ramirez were standing together at the corner and that it could have been Ramirez.  In fact, during his testimony Gandara had corrected his preliminary hearing testimony and stated the shooter had yelled the slur while running down the street toward Gandara's apartment.  The trial court denied the motion, which was made outside the jury's presence after the conclusion of the People's  initial closing argument, noting it had already instructed the jury that counsel's arguments were not evidence.  The court also stated Ramirez's counsel was free to discuss the clarification of Gandara's testimony in his closing argument and to tell the jury the prosecutor had misstated the evidence.

The court also offered to again admonish the jury; Ramirez's counsel accepted the offer.  Back in the jury's presence, the court stated:  "[B]efore [Ramirez's counsel] begins his closing argument, there was an issue regarding [the prosecutor's] closing argument regarding the evidence of what Joe Gandara . . . testified . . . as to when the person, the shooter, said "Fuck Fake Street. . . .  So when you hear [counsel's] arguments, . . . they are just arguments.

As part of the instructions that I gave you I told you what they say is not evidence. . . . These are their arguments as to how you should look at the facts and the evidence in relation to the law; however, it is your recollection, your memory, the court reporter's record, the exhibits, that is the evidence that you shall base [the verdict] on. . . . So [Ramirez's counsel] will be addressing that, but just keep that in mind. If . . . you feel that your memory of what the evidence is conflicts with what they're saying, you are the judges of the facts and you are to determine what is true or not." After this admonition Ramirez's counsel commenced his closing argument and specifically addressed the discrepancy in the evidence and the prosecutor's misstatement of that evidence and reminded the jury they could ask for the pertinent testimony to be read to them. In his rebuttal argument the prosecutor acknowledged his error and stated he in "no way" intended to mislead the jury.

The jurors were properly advised of the prosecutor's unintentional misstatement of the facts, the inconsistencies in Gandara's preliminary hearing and trial testimony and their own obligation to decide the case based on the evidence and not the arguments of counsel. The trial court, therefore, ensured Ramirez suffered no harm because of any misstatements by the prosecutor during closing argument. (See *People v. Martinez* (2010) 47 Cal.4th 911, 957 ["[e]ven if the prosecutor's argument could be interpreted as . . . improper . . . , it is not reasonably probable that the verdict would have been more favorable to defendant without the misconduct"]; *People v. Wallace* (2008) 44 Cal.4th 1032, 1070-1071 ["'[a] defendant's conviction will not be reversed for prosecutorial misconduct' that violates state law, however, 'unless

it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct'"].)

**DISPOSITION**

Ramirez's convictions for attempted deliberate, willful and premeditated murder, together with the associated criminal street gang and firearm-use enhancements, are reversed. His convictions for assault with a firearm and shooting at an inhabited dwelling are affirmed but the related true findings on the criminal street gang enhancement are reversed. The cause is remanded to provide the People an opportunity to retry Ramirez on a legally viable theory of attempted murder and to retry the criminal street gang enhancements. If the People elect not to do so, Ramirez is to be resentenced in a manner that is consistent with this opinion and with the terms of all applicable ameliorative legislation.


PERLUSS, P. J.

We concur:



SEGAL, J.



FEUER, J.

31